David Merritt, *pro se*
Salma Merritt, *pro se*
660 Pinnacles Terr
Sunnyvale, CA 94085
408.469.5584
theadaadvocatea@gmail.com



FILED

JAN 16 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| DAVID MERRITT & SALMA MERRITT, | Case No.:17-CV-06101-LHK |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARTORY RELIEF** |
| vs. | |
| JP MORGAN CHASE, N.A., JAMIE DIMOND, DAVID GILLIS, STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., JOHN E. COSTANGO, AISLING DESOLA, SPECIALIZED LOAN SERVICER, TOBEY WELLS, AMI MCKERNAN, MICHAEL WARD, ZIEVE BRODNAX & STEELE LLP, JOHN STEELE, MICHAEL BUSBY, U.S. BANK NATIONAL ASSOCIATION, ANDREW J. CECERE, BRYAN CAVE, JAMES GOLDBERG, DAVID MCCALL, BEVERLY BROOKS, AVI MARCUS AND 10 UNKNOWN ASSISTANT GENERAL COUNSELS, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1. This is a wholly new action that arises from events which occurs *subsequent to the claims currently pending before the California Court of Appeals*—who has twice issued

**FIRST AMENDED COMPLAINT**

**reversals** on erroneous state court dismissals—and the Ninth Circuit Court of Appeals which has also **reversed and remanded** a faulty dismissal that Defense had persuaded the District Court to enter in 2009. Only for the purposes of background/historical facts in order to demonstrate motives or intents for the pattern of racketeering and in the spirit of full disclosure to this Court, does the Plaintiffs cite 2006 to 2009 events for context where needed.

2. Specifically, this action does not seek, *in any way,* relief for the alleged fraudulent 2006 origination, servicing or 2009 modification of loans.

3. This action is based on the 2017 culmination of the unlawful conspiracy to illegally collect debt from Plaintiffs; the **recording** of **fraudulent /falsified documents in the public record system and basing debt collection thereon,** the racketeering which forms the basis of these 2017 debt collection activities and the Defendants reliance on the 2011 to 2017 fraudulent activities to ostensibly legitimize their 2017 unlawful debt collection practices which contravene federal RICO statutes not to mention California, Colorado, New York, Delaware and Wisconsin state common law fraud. Otherwise, all claims herein are solely based on events that take place from 2010 to 2017, which are well beyond the scope of the allegations that is being litigated before the 9th Circuit and state court of appeals

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 18 USC § 1961, 1962(c), 1962(f) and 1964; 28 USC §§ 1331, 1332 & 1367, 15 USC § 15 USC §§ 1692c(a)(2), 1692d, and 1692e. Personal jurisdiction over defendants is via 18 USC §§ 1965(b) and (d); 42 USC §§ 1985 et seq. There is Diversity of Citizenship concerning the tortious actions alleged and violations of RICO by Defendants since the Defendants states of incorporation are the State of Deleware, New York, Colorado and California, while the Plaintiffs are residents of California.

2. Venue is proper because Plaintiffs reside in California, the damages arise in California along with the outcome of the alleged fraudulent acts.

## PARTIES TO THE ACTION

3. Plaintiffs Salma Merritt and David Merritt (the "Merritts") are homeowners who reside in Santa Clara County California. They have both been harmed in both violations of civil rights

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

1  and economically by paying over $150,000 in fraudulent loan payments that did not go towards
2  principle of loan, stripped of more than $100,000 in equity from their property, loss over
3  $1,000,000 in wages and personal savings, and untold millions in wage and compensation losses
4  from corporate and other business interests.

5  **Institutional Defendants'**

6  4. Defendant **BEAR STERNS**[1], at all times herein mentioned was, a corporation
7  organized and operated under New York State laws and conducted daily business within and
8  through the State of California. Bear Sterns acted as a principle with co-conspirator of BofA
9  Board Officers, CFC Board Officers, Wells Fargo et al., under the authority and guidance of its
10  CEO James Cayne and Board of Directors from 2000 through 2008. It is fully liable for the
11  unlawful acts taken by its Board of Directors.

12  5. Defendant **JP Morgan Chase (JP Morgan)**, at all times material herein, was the
13  parent company of Structured Asset Mortgage Investments II, Inc. (SAMI) and ran its Board of
14  Directors ran its operation as a shell company. It is a corporation registered in Delaware and
15  New York, headquartered at 270 Park Ave, New York, NY 10017, with business operations in
16  California which involve thousands of business transaction 365 days per year from 2010 to 2017.
17  It was led by its CEO Jamie Dimond and its Board of Directors during the times herein, and is
18  liable for its unlawful activities conducted in its name by its Board.

19  6. Defendant **Structured Asset Mortgage Investment** II, Inc. (**SAMI**), at all times
20  relevant hereto operated as a front company for JP Morgan to conceal or evade direct scrutiny of
21  the fraudulent mortgage loans which JP Morgan Board of Directors registered under its name. It
22  is subsidiary or otherwise a company which is owned by JP Morgan. Its operations are within JP
23  Morgan's satellite offices at 383 Madison Ave, New York, NY 10179 and 4 Chase Metrotech,
24  Brooklyn, NY 11245 and is led by JP Morgan's Board of Directors through Aisling V. Desola. It
25  is liable for the unlawful activities conducted in its name.

26
27  [1] Although Bear Stearns was absorbed and incorporated into JP Morgan, its activities is germane to JP Morgan's subsequent fraudulent activities.
28

**FIRST AMENDED COMPLAINT**

7. Defendant **Specialized Loan Servicing,** at all times material herein, was a foreign corporation who registered in Colorado in order to develop a business that specialized in Debt Collection and Foreclosing on home owners who have been targeted with subprime loans, with business operations throughout the U.S. Its headquarters is at 8742 LUCENT BLVD, SUITE 300, HIGHLANDS RANCH, CO 80129.  It was led by its CEO Tobey Wells and its Board of Directors, and is liable for its unlawful activities conducted in its name by its Board.

8. Defendant **U.S. BANK National Association,** at all times material herein, was designated as Trustee for certificate holders of Bear Stearns ALT-A Mortgage Backed Trust 2006-2 Pass-Through Certificates, yet claimed no knowledge or interest in it or Plaintiffs loans. It is headquarted at 800 Nicollet Mall, Minn, MN 55402 with business operations occurring daily within California on a daily basis hundreds of times from 2008 to 2017. It was led by its CEO Andy Cecere and its Board of Directors, and is liable for its unlawful activities conducted in its name by its Board.

9. Defendant **ZIEVE, STEELE AND BODNAX,** at all times material herein, was a corporation registered in California acting as foreclosing debt collection agent of JP Morgan through its agents US Bank and SLS. Its main role is to threaten home owners with foreclosure unless a debt is paid and operates as a foreclosing debt collection Mill used to coerce, threaten and extort funds or properties from home owners when directed to do so by JP Morgan, US Bank, SLS. It is led by Les Zieve and has main offices at 30 Corporate Park, Irvine, CA 92606, a resident of California and is liable for its unlawful activities conducted in its name by its operating members Zieve, Brodnax & Steele.

10. Defendant **Bryan Cave,** is a Limited Liability Company whose principle executive offices are at 1 Metropolitan Square, ste 3600, St Loius, Mo. 63102, but at all times material hereto, conducted its debt collections operations out of Three Embarcadero Center, San Francisco, CA 94111 through James Goldberg et al. It is liable for the illicit activities conducted in its name.

**Individual Defendants'**

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

1      11. Defendant **JAMIE DIMOND**, at all times material hereto, was the CEO of JP

2  Morgan who managed and oversaw all operations in California and has daily communications

3  with employees therein. He operates out of JP Morgan 270 Park Ave, New York, NY 10017, a

4  resident of New York and is liable for his illegal acts acts or omissions alleged herein.

5      12. Defendant **David Gillis** at all times material hereto, functioned in JP Morgan's legal

6  offices before becoming Assistant General Counsel within JP Morgan, who was involved in

7  assessing, among other things, litigation that is pursued against JP Morgan. She operates out of

8  JP Morgan 270 Park Ave, New York, NY 10017, a resident of New York and is liable for her

9  illegal acts acts or omissions alleged herein

10     **13.** Defendant **JOHN E. COSTANGO,** at all times relevant herein, was the CEO of

11  Structured Asset Mortgage Investments (SAMI), a shell company or subsidiary of JP Morgan to

12  front as a company which fraudulently claims ownership of fraudulent mortgage loans, including

13  Plaintiffs. He is a resident of New York and operates out of JP Morgan's offices at 383 Madison

14  ave, New York, NY. 10179 and is liable for his acts or omissions alleged herein.

15     14. Defendant **AISLING DESOLA** at all times mentioned herein, functioned as front

16  person of JP Morgan's shell subsidiary SAMI operating out of 4 Chase Metrotech Center, Floor

17  22, Brooklyn, NY. 11245. She has regular communications with staff in California and is

18  involved in concealing JP Morgan identity from Borrowers. She is a resident of New York and is

19  liable for her illegal acts or omissions alleged herein.

20     15. Defendant **TOBEY WELLS,** at all times material herein, was the foreclosing debt

21  collector for JP Morgan and he functioned as CEO of SLS located at 8742 LUCENT BLVD,

22  SUITE 300, HIGHLANDS RANCH, CO 80129. He has daily contacts with agents located in

23  California and is a resident of Colorado. He is liable for his acts or omissions alleged herein.

24     16. Defendant **AMI MCKERNAN**, at all times material herein, was the foreclosing debt

25  collector for JP Morgan and she functioned as 2nd Vice President of SLS located at 8742

26  LUCENT BLVD, SUITE 300, HIGHLANDS RANCH, CO 80129. She has daily contacts with

27  agents located in California and is a resident of Colorado. She is liable for her acts or omissions

28  alleged herein.

**FIRST AMENDED COMPLAINT**

17. Defendant **MICHAEL WARD**, at all times material herein, was the foreclosing debt collector for JP Morgan and he functioned as 2nd Vice President of SLS located at 8742 LUCENT BLVD, SUITE 300, HIGHLANDS RANCH, CO 80129. He has daily contacts with agents located in California and is a resident of Colorado and is liable for his acts or omissions alleged herein.

18. Defendant **JOHN STEELE,** at all times material herein, was the managing partner of Zieve, Brodnax & Steele and oversees the entire operations of this foreclosure debt collecting Mill. He is a resident of California and located at 30 Corporate Park, Irvine, CA 92606, and is liable for all of his acts or omissions alleged herein.

19. Defendant **MICHAEL BUSBY**, at all times material herein, was functioning as JP Morgan, US Bank and SLS foreclosing trustee. He is a resident of California working out of 30 Corporate Park, Irvine, CA 92606. He is liable for his unlawful acts or omissions alleged herein.

20. Defendant **ANDREW CECERE,** at all times material herein, was the CEO for the Trustee US Bank who pretended to be trustee of Plaintiffs loans and registered as trustee for of Bear Stearns ALT-A Mortgage Backed Trust 2006-2 to which loan was purportedly assigned. He is a resident of Minnesota with offices at Nicollet Mall, Minn, MN 55402 and is liable for his unlawful acts or omissions alleged herein.

21. Defendant **James Goldberg**, at all times material hereto, was a partner at Bryan Cave whose activities was to collect debt from Plaintiffs on behalf of JP Morgan and its affiliates. He is a resident of San Francisco California and works out of Three Embarcadero Center, San Francisco, CA 94111 and is liable for the illicit acts and omissions alleged herein.

22. Defendant **David McCall**, at all times material herein, was functioning as California Notary Public who teamed up with Defendant Brooks to forge county records as a Notary Public license #19+25272. He is a resident of California working out of Los Angeles whose specific address is currently unknown. He is liable for his unlawful acts or omissions alleged herein

23. Defendant **Beverly Brooks**, at all times material herein, was functioning as a staff recruiter for Elwood Staffing Services, Inc. 294 E. Moana Ln Ste.27 Reno, NV, 89511, working out of its Los Angeles offices who teamed up with Defendant McCall to falsify county records.

**FIRST AMENDED COMPLAINT**

1   She is a resident of California working Elwood Staffing offices and is liable for her unlawful acts
2   or omissions alleged herein.

3       24. Defendant **Avi Marcus,** at all times material herein, was functioning Counsel
4   Associate Corporate Secretary for MERSCORP Holdings, Inc., located at 1818 Library St. #300,
5   Reston, VA 20190. He is currently a resident of Florida, working at 1410 N. Westshore Blvd, Ste
6   800, Tampa, Fl. 33607. He is liable for his unlawful acts or omissions alleged herein.

7   **STATEMENT OF FACTS**
8   **JP MORGAN & Dimond Agrees to Cover Up Fraud & Unjustly Enriches Itself**

9       25. On or about March 2008, as Bear Sterns massive fraud upon its "Investors" began to
10  surface and criminal and civil prosecutions were unfolding, its entire board of directors held
11  meetings in their New York HQ with JP Morgan CEO and struck a deal with JP Morgan and its
12  entire board to sale them their over $350 Billion company for less than a billion dollars, or $2 per
13  share; as long as JP Morgan agreed to cover up and defend Bear Stearns Board from civil and
14  criminal prosecution; however, the stock holders revolted at the $2 per share, resulting in JP
15  Morgan paying $10 per share, or under two billion dollars.

16      26. Plaintiffs being informed alleges upon information and belief that the price paid for
17  Plaintiffs mortgage was less than one-hundred (100) dollars.

18      27. From May 2008 and each and every week until on or about May 2014, Defendants
19  Dimond and Board directed their staff to audit every asset acquired from this Bear Stearns
20  purchase and among other things, Dimond et al received reports that over 60% of the mortgage
21  backed securities contained borrower mortgages which involved fraud that was perpetrated upon
22  borrowers who qualified for prime loan, but were duped into signing onto subprime loans.

23      28. JP Morgan staff also uncovered that over 70% of the funds used by Bear Stearns
24  which supplied the funds to Countrywide Financial et al, was obtained from investors who Bear
25  had defrauded as well.

26      29. From on or about May 2013 to January 2017, Defendants did not send any notices for
27  debt collection, and did not take any debt collection efforts, even though the last payment was
28  not made since October 2008

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

30. From on or about January 13, 2008 to March 24, 2008, Bear Stearns CEO Cayne and Board members held a series of meetings met with JP Morgan Dimond and his board at their New York HQ's where they discussed the sale of Bear Stearns to JP Morgan.

31. Plaintiffs being informed believes and hereby alleges that during January 2008, Cayne had explained that Bear Stearns was facing bankruptcy and collapse due to it using investor funds for lending in the residential home mortgage market where billions of dollars in fraudulent mortgages were produced for Bear Stearns MBS's.

32. Continuing ibid. Cayne expressed concern that if he permitted his company to go into Bankruptcy receivership that the fraud which was perpetrated against market investors and the fraud that made up the MBS loans, would surface and he along with his Board would be vulnerable to civil and or criminal prosecution.

33. Continuing ibid. he then proposed to Defendant Dimond that if he were able to convince Bear Stearns board to give JP Morgan all of its $350 billion of stock for $2 per share, would Dimond be able to convince JP Morgan's board to do whatever it could to cover up the fraud that Bear Stearns committed in producing its MBS's, from investors, governments prosecutors and borrowers?

34. Defendant Dimond, from on or about February 9 to March 10, 2008, held multiple talks with JP Morgan board members at its New York HQ, explaining Cayne's proposal and one by one he gained the approval of each board member.

35. On or about March 16, 2008, JP Morgan made a formal offer to Bear Stearns to by it for $2 per share; however, there was a revolt by Stockholders, who filed class action, and a settlement was reached where $10 per share would be provided or about 1.2 billion dollars'.

36. Plaintiffs being informed believes and hereby alleges that JP Morgan's purchase of Bear Stearns amounted to it paying less than $100 for each residential mortgage loans that Bear Stearns fraudulently originated through CFC et al.

37. Plaintiffs being informed believes and hereby alleges that from 2008 to 2017, JP Morgan wrote off millions in its yearly tax filings where it reported losses pertaining to Bear Stearns assets/liabilities.

**FIRST AMENDED COMPLAINT**

38. Plaintiffs being informed believes and hereby alleges that each year from 2008 to 2017, JP Morgan wrote off losses pertaining to Plaintiffs loans in its yearly tax filings so that by 2017 its tax burden was reduced by more than 1 million dollars which it would have otherwise paid had it not written Plaintiffs loans off as losses.

39. The fraud committed by Bear Stearns and CFC are part of current litigation covering the 2006 to 2010 time period. See *Merritt v. Countrywide Financial Corp*, 759 F.3d 1023 (9th Cir. 2014)(Reversed and remanded); *Merritt v. Wells Fargo*, et al, H036259 (6th Dist.)(reversed and remanded); *Merritt v. Mozilo*, et al, H037414 (6th Dist.)(reversed and remanded) and back on appeal in 9th Circuit 16-16311. *Merritt v. Countrywide et al*, and back on appeal in California Court of Appeals 6th District H041560 (6th Dist.)

**Endorsed Note Not Transferred With Deed of Trust & Modification Attempt To Cover Up**

40. On or about January 2004 and each year to on or about January 2008, CFC and Bear Stearns board members assigned its employees to sign Servicing and Pooling Agreements on behalf of each company which required for home mortgages endorsed Notes to be delivered into Bear Stearns Trust on or before certain designated dates.

41. Plaintiffs are informed and believe and thereby alleges that from on or about January 2004, to December 2004, that Mozilo and Cayne held a series of phone talks between their respective offices in New York and California, where they discussed concealing Bear Stearns identity from the mortgage borrowers and Cayne asked Mozilo was he willing to not follow Uniform Commercial Code (UCC) laws as they relate to securities instruments by destroying the original endorsed notes in order to cover up Bear Stearns ownership of the mortgages in the event his and Mozilo's fraud was exposed in future.

42. Mozilo thereat stated that he had no problem with violating UCC as they relate destroying the Notes in order to conceal Bear Stearns identity in being the funder of loans while representing to the public and borrowers that they have and maintain the endorsed notes on loans

43. Based on the Servicing and Pooling Agreement entered into by CFC and Bear Stearns, CFC agreed to deliver on or before May 2006, an endorse Note together with original Deed of Trust assignment that was signed by Plaintiffs into Bear Stearns ARM trust, mortgage

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

pass-through certificates, series 2006-2 to its custodian of trust, Wells Fargo, in Maryland; however, based on information and belief, the original endorsed Notes were never delivered to Wells Fargo, making it void under California and UCC.

44. In 2011 and 2013, the California Court of Appeals acknowledged that Plaintiffs allegations against Bear Stearns/JP Morgan, CFC, BofA and their respective CEOs stated cognizable causes of action for conspiracy to commit fraud and that the modification agreement was never consummated and used to cover up the fraud from 2006 to 2009.

45. From February 2009 to July 2017, Defendants took no action to enforce the falsified debt via any civil action and JP Morgan publicly and privately represented to the Plaintiffs that it did not own any loans of the Plaintiffs, had no interest in their property and Plaintiffs were misinformed.

46. In February 2013, four years from modification, the statute of limitations expired on Defendants standing to sue for any debt pertaining to Plaintiffs property.

47. In 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016 and 2017, Plaintiffs called and sent letters to CFC, BofA, Bryan Cave, Recontrust, SLS and ultimately US Bank, JP Morgan, Zieve, Brodnax and Steele and their respectively CEOs and Board of Directors for a copy of the endorsed note and proof that it along with the Deed of Trust assignment was actually delivered to Bear Stearns ARM trust, mortgage pass-through certificates, series 2006-2.

48. In each of these years ibid. the Defendants staff had at first informed Plaintiffs that they could not locate the endorsed note or any proof that it had physically been delivered into the Trust, and later changed the story in September 2017 that yes they have such, but would only provide Plaintiffs a certified copy of such if they paid off the fraudulently produced loans.

49. On or about January 2011, trustee Recontrust informed JP Morgan that it was not going to be able to enforce the fraudulent modification and that it would have to find another.

50. On or about April 2011, based on information and belief, it is alleged that Defendants Dimond and his board spoke with US Bank and Cecere from their New York offices, explained that Plaintiffs mortgage was based on fraud and falsified information committed by CFC and Bear Stearns, that he and his board wished to distance and conceal JP Morgan's involvement in

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

1   Plaintiffs mortgage, then asked whether Cecere and his US Bank board would be willing to

2   became trustee over the fraudulent mortgage for a certain compensation.

3         51. Continuing on information and belief, Defendant Cecere told Dimond that he agreed

4   and would use US Bank to act as Trustee in order to help him conceal JP Morgan's involvement.

5         52. Furthermore, Plaintiffs are informed and believe, and allege that between January

6   2010 to May 1, 2011, JP Morgan staff became repeatedly aware that the original endorsed Note

7   and Deed of Trust was never secured or otherwise delivered to Bear Stearns within the legal time

8   frame allotted and they contacted BofA staff about this.

9         53. Plaintiffs being informed and believes, and therefore alleges that on or about May 1,

10  2011, JP Morgan board was notified about Plaintiffs and other borrowers loans not having the

11  original endorsed notes delivered to the Caretaker of Bear Stearns ARM trust, mortgage pass-

12  through certificates, series 2006-2 within the timeframe allotted and that they are deemed void

13  under the law.

14        54. Plaintiffs are informed and believe and hereby alleges that Defendants Dimond and

15  his board met at their offices to discuss this issue in a series of meetings from on or January 2011

16  to May 2011, and they then decided that they needed to cover up this past failure by falsifying a

17  new Assignment of the Deed of Trust to another in hopes of causing confusion and covering up

18  not having a Note, trail of fraud committed by Bear Stearns, CFC, BofA et al.

19        55. On or about May 11, 2011, Defendant Dimond and his Board then approved for their

20  employees to contact BofA and directed its staff to falsify a reassignment of Deed of Trust on the

21  mortgage that CFC had fraudulent originated in 2006 against the Plaintiffs and mail it to Santa

22  Clara County for recording naming US Bank as trustee and paying consideration to do so.

23        56. On or about May 4, 2011, Beverly Brooks, a robo signer for hire, was hired by

24  Dimond and his board to falsify an assignment of deed of trust regarding the fraudulent first

25  mortgage of March 2006, whereby she would falsely represent herself as an actual employee of

26  MERS, when she was in fact a pretending one; falsify that she had the authority and interest to

27  reassign trusteeship from Recontrust to US Bank and give the appearance that it was a legal and

28  legitimate instrument.

PAGE 11

**FIRST AMENDED COMPLAINT**

57. On or about May 4, 2011, Defendants Dimond, Gillis called from their offices to BofA Deseor in her Los Angeles office, asking her to direct BofA staff to hire one of their robo-signers to forge and falsify an assignment of deed of trust on Plaintiffs property then have it recorded with the Santa Clara Recorders office.

58. On or about May 4, 2011, BofA staff complied with Dimond and Gillis' instructions, hired Defendant Brooks to pretend as if she was a bonafide employee of MERS who had reviewed and confirmed Plaintiffs Note, Deed of Trust etc, but never saw nor confirmed any document, then signed an assignment of deed of trust which listed MERS as only the "nominee" who had no authority to reassign the mortgage, then mailed it to Santa Clara Recorders office with filing fees and instructions to file it on public record.

59. The Santa Clara County Recorder did record this falsified Assignment, unbeknownst to her, accepted Defendants payment and mailed it back per instructions.

60.

### Plans to Obstruct Justice; Intimidate Plaintiffs from Being Party & Witness

61. On or about March 2008, based on information and belief, Defendants Dimond, Gillis and JP Morgan board members held a series of talks in their New York offices concerning Bear Stearns acquisition, and Gillis informed them that a large percentage of the mortgage loans that populated the Mortgage Backed Security Trust (MBS) which they were acquiring from Bear Stearns were predatory subprime loans which were originated through fraud by Countrywide Financial (CFC) and others and that they needed to shield JP Morgan from being held liable for any of these loans they acquired, while at the same time, holding all borrowers liable for the loans.

62. Based on information and belief, it is alleged that Dimond and the other board members stated to one another that they needed to distance JP Morgan's interest from, and conceal its ties to these MBS from borrowers, such as the Plaintiffs, so that they can evade civil or criminal prosecution and appear publicly, and they told Gillis and other staff to see that the Bear Stearns MBS are assigned to a subsidiary company so as to give JP Morgan a way to deny

PAGE 12

**FIRST AMENDED COMPLAINT**

1  any interest or involvement in loans such as the Plaintiffs and evade any future fraud which they

2  may have to commit in connection with such mortgages.

3    63. On or about March 2008, Defendant Unknown GC and Dimond, based on

4  information and belief, met in Dimond's office where he explained to Unknown GC the decision

5  of JP Morgan's board to cover up Bear Stearns fraud and its ties to the fraudulent mortgages

6  which populated Bear Stearns ALT-A Mortgage Backed Trust 2006-2 Pass-Through Certificates

7  (Bear Stearns Trust) and asked if they were willing to ensure that all persons assigned to be

8  SAMI's officers were loyal to JP Morgan and maintain the concealment that the board desired.

9    64. Continuing on information and belief, Defendant Unknown GC told Dimond that he

10  would take on such a role and help Dimond and the board cover up their own as well as Bear

11  Stearns fraud and connection to the fraudulent loans and Trust.

12    65. On March 16, 2008, Defendants Dimond assigned Unknown GC to lead these efforts

13  within JP Morgan's subsidiary company, Defendant Structured Asset Mortgage Investments II

14  (SAMI), in order to conceal JP Morgan's interest and involvement in the prior and subsequent

15  fraud to come.

16    66. From March 2006, to March 2009, David and Salma Merritt (the Plaintiffs) were

17  witnessed to Countrywide Financial Corp. (CFC) fraud in the origination of mortgages, servicing

18  fees and Bank of America's (BofA) fraud in the servicing fees as well as modification of

19  mortgages.

20    67. Based on information and belief, once Plaintiffs exercised the right to rescind

21  mortgage loans on or about January 2009, it is alleged that on or about February 2009, BofA

22  Home Loan staff in Los Angeles offices taken over from CFC buyout, contacted some Unknown

23  JP Morgan staff Defendant (Unknown Staff) in its New York offices, faxed all of the

24  communiques that Plaintiffs had served on BofA and CFC since 2006 as well as all of the

25  documents related to loans, asking them what actions did Defendant Dimond and his Board

26  wished for BofA to do as servicer.

27    68. Continuing on information and belief, this Unknown Staff promised to learn the

28  answer to that question and would then communicate back with them.

**FIRST AMENDED COMPLAINT**

69. Based on information and belief it is alleged that Unknown Staff communicated with Dimond at his office, presented Plaintiffs file containing all loan and communiques from them along with BofA's question to him on or about February 2009.

70. Continuing on information and belief Defendant Dimond along with senior staff reviewed Plaintiffs notices and evidence describing fraud by Bear Stearns-CFC activities from 2006 to January 2009, then told Unknown Defendant Staff to have BofA induce the Plaintiffs into accepting a modification of the fraudulent mortgages in order to cover up Bear Stearns-CFC fraud of that period.

71. Therefrom this Unknown Staff called from JP Morgan's New York office to BofA staff in Los Angeles on or about February 10, 2009, asked them whether they would agree with Dimond's plan, and the BofA staff contacted B. Deseor in her L.A. office asking the same.

72. On or about February 10, 2009, based on information and belief, B. Deseor reviewed Plaintiffs mortgage files, recognized that they were produced through her predecessor's fraudulent practices, then told her staff to agree with JP Morgan's plan.

73. Based on instructions from Defendant Dimond through JP Morgan staff, BofA staff told Plaintiffs during February 2009, that they would modify the two 2006 mortgages into one loan which was promised in 2006 with monthly payments peri-$2,200 per month.

74. On or about February 24, 2009, based upon this representation, Plaintiff signed the contract, but within 48 hours cancelled it once they had a lawyer review it and determined that it was another false promise.

75. On March 18, 2009, the Plaintiffs exercised their right to pursue civil rights claims and filed a federal action for the fraud, race, gender discrimination and other violations that they faced at the hands of Bear Stearns-Countrywide Financial Corporation (CFC) and its officers from 2006 to 2009, but naming Bear Stearns/JP Morgan as Doe defendant. *Merritt v. CFC et al,* C-09-01179.[2]

---

[2] JP Morgan was enforcing a practice to conceal its identity from Plaintiffs and other borrowers who it and or Bear Stearns had defrauded.

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

76. This action was dismissed on October 28, 2009 and Defendant Goldberg contacted the Plaintiffs on or about October 30, 2009, asking them what their intent was.

77. The Plaintiffs told Goldberg that they would be appealing the dismissal of the case to the 9th Circuit, and Goldberg stated that they had no chance of prevailing on appeal and that unless they faced this fact they were endangering their finances and property.

78. Defendant Goldberg then called from his office to JP Morgan General Counsel (GC) office in New York on or about October 28, 2009, along with BofA Assistant GC in North Carolina, and based on information and belief it is alleged that he spoke with an Unknown Named Assistant GC (heretofore cited as "Unknown GC") for JP Morgan and BofA, told them about the dismissal, faxed and emailed a copy of dismissal, told them about Plaintiffs intent to appeal then asked what his and Bryan Cave's next steps should be.

79. Continuing on information and belief, Unknown GC told Goldberg that he would communicate with his superiors on this question and get back in touch with him.

80. The Unknown GC then contacted Defendant Dimond and other JP Morgan officers/staff informing them that the case was dismissed and that the Plaintiffs would be appealing it to the 9th Circuit; asking how they wished for things to be handled against the Plaintiffs.

81. On this same information and belief, on or about November 9, 2009, Dimond and other staff discussed how the Plaintiffs was challenging the fraud which Bear Stearns and CFC perpetrated against them, evaluated their mortgages and saw how they were based on falsified information that was entered after origination; that they did not have the endorsed note; and it was never transferred to Bear Stearns trust as Uniform Commercial Code (UCC) mandated for financial instruments.

82. From on or about April 2009 to November 2009, BofA transmitted to Defendant JP Morgan GC offices copies of every communication that the Plaintiffs had sent to Countrywide, Bank of America (BofA) and others which explained how they were defrauded and showing how the mortgages and modification were based on falsified information and these communications became directly known to Defendant Dimond during this same period.

**FIRST AMENDED COMPLAINT**

83. On or about April, August and November 2009, Unknown GC notified JP Morgan's board in these months about Plaintiffs and other borrowers around the U.S. who had provided evidence that their mortgages were induced and produced on fraudulent conduct by Bear Stearns and the agents it hired to originate loans for its mortgage backed security trusts'(MBS).

84. Based on information and belief or about August 2009, Defendant Dimond learned at his office, through Unknown GC, that Plaintiffs were given blank loan documents in 2006 and Bear Stearns with Countrywide (CFC), subsequently filled in the blank loan documents with falsified payment, interest and other data which they withheld from Plaintiffs until January 2009.

85. From on or about January 2009 and each day through December 2010, JP Morgan's auditors examined and evaluated the mortgages which was assigned to Bear Stearns ALT-A Mortgage Backed Trust 2006-2 (Bear Stearns Trust) and others, made findings that an overwhelming percentage of the mortgages like Plaintiffs were based on false information and fraud, then reported their findings to Dimond and JP Morgan's Board.

86. Based on information and belief it is alleged that each time during 2009 and 2010 that Dimond received reports about the false information that mortgages were based on, learned that Plaintiffs never agreed to a second mortgage (HELOC), but was tricked into accepting it by Bear Stearns-Countrywide actions; the that Plaintiffs had made over $140,000 in payments which was supposed to pay down the interest and principle, but failed to do so; more than $14,000 in falsified overcharges were being sought from them which was not due; he each time ignored such facts, took no actions to correct it, and directed JP Morgan subordinates to collect debt which was based on these falsified or fraudulent mortgages.

87. On or about November 9, 20109, based on information and belief, Dimond and other officers talked in their offices about Plaintiffs plans to appeal the October dismissal of case, and Dimond asked them whether they should permit such or direct BofA and Bryan Cave to intimidate and threaten them and they agreed at this meeting to have Bryan Cave and BofA do the latter.

88. Based on this same information and belief, Dimond then communicated with K. Lewis at BofA offices and asked him whether he would disagree with attempting to intimidate

**FIRST AMENDED COMPLAINT**

1   and threaten the Plaintiffs for continuing to seek judicial review of the fraudulent and falsified

2   mortgages with foreclosure on their property.

3      89. During this same conversation, continuing on information and belief, K. Lewis told

4   Dimond that he agreed to direct his subordinates to threaten and intimidate the Plaintiffs with

5   foreclosure proceedings.

6      90. Continuing on this information and belief, Defendant Dimond and his subordinates

7   also reasoned that if they rectified Plaintiffs falsified mortgages, that it may open the door to for

8   many other borrowers to demand that their falsified and fraudulent mortgages be redone: i.e.

9   thousands of loans which involved billions of dollars in mortgages based on falsified information

10  and so they decided at this meeting to seek the collection of modification payments in hopes of

11  deterring Plaintiffs from being a party in litigation and to nullify and cover up the fraud which

12  was committed from 2006 to 2009

13     91. Unknown GC, from JP Morgan offices, contacted BofA and Bryan Cave on or about

14  November 9, 2009, at their California offices asking Goldberg and Deseor whether or not they

15  agreed with these plans or had objection to collecting debt which is based on the falsified

16  information, and Goldberg and Deseor told Unknown GC in this conversation that they agreed

17  with it, supported it and would enforce it right away.

18     92. With this assurance, Unknown GC authorized Goldberg, on behalf of Bryan Cave,

19  and BofA to take whatever actions they deemed appropriate to collect the debt from Plaintiffs the

20  risk that they run in not having Plaintiffs to make payments on the modification which they

21  cancelled in February of 2009 and the fact that Dimond had promised Bear Stearns Board that JP

22  Morgan's Board would do all they could to cover up the frauds that they committed against

23  borrowers such as the Plaintiffs. decided to have Bryan Cave threaten and intimidate the

24  Plaintiffs in hopes of coercing them to make payments on modification agreement that they

25  cancelled in February 2009.

26     93. Defendant Goldberg called Plaintiffs at their home from his office on or about

27  November 15, 2009, telling them that if they allowed the District Court's dismissal to be final

28

PAGE 17

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

and not appeal, that he would see about getting the back payment on the modification expunged and see if his client would explore ways to get the two mortgages into one.

94. The Plaintiffs told Goldberg that if he would put that in written they would agree, but they had to file their notice of appeal next week.

95. On or about November 23, 2009, Defendants Dimond and Goldberg authorized BofA staff to threaten Plaintiffs with foreclosure and they caused to be sent a communique which threatened such.

96. Around the same time the Plaintiffs filed notice of appeal, becoming party and witness in that Court concerning Defendants fraud, but it was not until 2014 until the 9th Circuit reversed and remanded the case.

**Plaintiffs Become Party & Witness In State Action**

97. Because the Defendants were pursuing to threaten and intimidate Plaintiffs with foreclosure, versus letting status quo remain until the 9th Circuit ruled on the case, they filed state claims on December 22, 2009, which more clearly demonstrated Bear Stearns-JP Morgan involvement in fraud as Doe defendants.

98. On or about December 22, 2009, BofA was served with this state action, faxed it to Defendant Dimond and his Board, asking them for instructions on what they wished to do.

99. On information and belief, it is alleged that on or about December 22, 2009, Defendant Dimond from his office called K. Lewis in his North Carolina office and he asked Lewis his opinion on whether he should settle the case with Plaintiffs—which may expose JP Morgan to thousands of borrowers who had fraud committed against them—or they could direct BofA as servicer and Bryan Cave as defense team, to do whatever it took to persuade it into dismissing this case as well.

100. Based on same information and belief, Lewis told Dimond that settling with Plaintiffs may expose JP Morgan to thousands of borrower claims of fraud which would diminish its MBS profits and may expose it to criminal charges and so he believed that they should do all that they could to enlist Bryan Cave to attack, threaten and intimidate the Plaintiffs into dismissing or otherwise do anything to get the case dismissed.

**FIRST AMENDED COMPLAINT**

101. Defendant Dimond then directed his subordinates to authorize BofA and Bryan Cave to do whatever it took to continue to conceal its identity, liability and involvement in the loans and direct them to take actions which would intimidate and threaten the Plaintiffs to hinder, obstruct and undermining their court cases.

102. Based on information and belief, it is alleged that on or about December 2009, Unknown GC in JP Morgan New York office contacted BofA GC in Los Angeles and Bryan Cave liaison in New York, asking them whether they would agree with Defendant Dimond's plan, and they told him that they did agree to do this and would communicate with Defendant Goldberg to obtain his agreement as well.

103. On or about December 2009, Unknown GC in BofA Los Angeles office called Defendant Goldberg, explained the discussion and request of Dimond and Lewis, then asked him whether he would agree to implement this plan.

104. Based on information and belief, Goldberg told them that he agreed to do so.

105. From February 2010 to and beyond June 2011, the Plaintiffs diligently sought to have CFC, BofA et al disclose evidence which was in their sole care and custody first through direct talks with Goldberg on a monthly basis, then by filing requests for discovery and ultimately by filing motions to compel information.

106. Based on information and belief, it is alleged that on or about from May 2010, Goldberg called from his office to BofA Unknown GC in North Carolina and JP Morgan Unknown GC, reporting Plaintiffs requests' to have BofA et al to provide information to them which would reveal Bear Stearns involvement which he believed which would expose JP Morgan', then Goldberg asked these GCs what did they wish for him and Bryan Cave to do and they stated that they would check with their superiors and contact him.

107. Based on information and belief, it is alleged that on or about June 2010, these Unknown GCs respectively informed Dimond and Lewis then arranged for teleconference between them where they spoke about whether to permit the Plaintiffs to access any information

**FIRST AMENDED COMPLAINT**

108. Goldberg faxed, email or mailed discovery requests to BofA GC in North Carolina, who in turn faxes requests to JP Morgan Unknown GC, then they each conducted a teleconference from their respective offices to discuss the Plaintiffs requests.

109. Based on same information and belief, Goldberg explained to these GC's that if he complied with discovery rules and provided the evidence that Plaintiffs were seeking, that he would not be able to conceal JP Morgan's involvement, its liabilities or identity and he asked them what did they wish for him to do.

110. The two GC's told him that they would have to confer with K. Lewis and Dimond for that answer and would get back in touch with him on the question.

111. On or about September 2010, based on information and belief, JP Morgan's Unknown GC spoke with Defendant Dimond in New York office, explained Goldberg's message and asked him for instructions.

112. Continuing on information and belief, Defendant Dimond told Unknown GC to ask BofA and Goldberg to disregard California discovery rules, stall, promise, lie and otherwise do whatever he could to prevent Plaintiffs from uncovering evidence which would show JP Morgan's interest and involvement in their loans and JP Morgan would generously compensate Bryan Cave and Goldberg for doing so.

113. On or about September 2010, Defendant Goldberg received a call at his office from the Unknown GC in New York, as well as from BofA's Unknown GC who both asked him whether he would agree to implement Dimond's plans, and Goldberg, during these conversations told them that he was agreeable to implement Dimond's plan to do whatever he could to prevent Plaintiffs from uncovering such evidence in order to cover up Bear Stearns fraud and JP Morgan's subsequent involvement and identity.

114. From September 2010 and every month and year to 2015, Goldberg implemented Dimond's plan by, at first, telling the Plaintiffs that under the law discovery had to wait until the judge finalized the issues after demurrers, then once that was done, he openly rejected providing any evidence that the Plaintiffs needed and requested to prosecute their state claims.

**Plaintiffs Investigation Leading To Uncovering Bear Stearns As Doe Defendants**

**FIRST AMENDED COMPLAINT**

115. From on or about September 2010 to January 2011, Plaintiffs successfully prevails in having court compel Wells Fargo to disclose documents, so that during February 2011, it produced some 700 documents related to their loans, including but not limited to evidence that Bear Stearns was the actual funder of Plaintiffs loans, actually hired CFC to steer them into subprime versus the prime loan that they qualified for and concealed Bear Stearns identity from Plaintiffs and the public.

116. Although the Plaintiffs received these documents in February/March 2011, it would take months of reading before they came to identify Bear Stearns, but not JP Morgan at this time.

117. Based on information and belief, it is alleged that on or about February 2011, Defendant Goldberg called from his office to an Unknown GC within BofA Los Angeles office and JP Morgan's Unknown GC in New York, and he mailed, emailed or faxed them the discovery that Wells Fargo had served on Plaintiffs; explained to them that it contained evidence which would uncover Bear Stearns being the actual orchestrator behind CFC's fraud and that it was only a matter of time before the Plaintiffs were able to connect JP Morgan to Bear Stearns.

118. Continuing on information and belief, Goldberg also told these Unknown GC's that this would lead to JP Morgan liability for fraud unless steps were taken to further isolate it from having any direct connection with the Plaintiffs loans and he called BofA's and JP Morgan's Unknown GCs then asked them whether they could take any steps to further isolate JP Morgan's identity from Plaintiffs and if so that he advised them to do so.

119. On or about April 15, 2011, the Plaintiffs filed and served their third amended complaint (TAC) upon Goldberg and Dimond's BofA agents, and based on information and belief, it is alleged that Defendant Goldberg faxed or emailed a copy of Plaintiffs third amended complaint (TAC) from his office to Defendant Unknown Named GC and called him to discuss the TAC.

**Formation of JP Morgan-SLS Enterprise**

120. Based on information and belief, on or about April 15, 2011, Defendant Goldberg and Unknown Named GC, within their respective offices, talked about Plaintiffs TAC, and Goldberg explained that it appeared that the TAC met all of the pleading standards for fraud and

**FIRST AMENDED COMPLAINT**

1    unfair business practices against CFC, BofA and the Doe Defendants who are actually Bear

2    Stearns Board and staff, which Goldberg explained meant that JP Morgan involvement could be

3    discovered by Plaintiffs through discovery and potentially would face a jury.

4       121. Continuing with this discussion, Unknown GC asked Goldberg what would he

5    advise and Goldberg replied that JP Morgan needed to forge an Assignment of Deed of Trust that

6    removes Plaintiffs loans from BofA to another who is not being sued by Plaintiffs in order to

7    further conceal JP Morgan involvement of their mortgage, because if the next round of

8    demurrers were overruled, JP Morgan needs to maintain that it has no interest in their mortgage.

9       122. Based on information and belief, it is alleged that from on or about April to May

10    2011, Defendant Gillis, Unknown GC and other JP Morgan staff in New York offices held a

11    series of multiple weekly talks with one another, including Defendant Dimond and other Board

12    officers about Goldberg's suggestion and explained what he told them about Plaintiffs TAC most

13    likely surviving another demurrer and if that occurred, it would expose BofA and Wells Fargo to

14    discoveries that may disclose Bear Stearns identity which would expose JP Morgan's identity.

15       123. Based on information and belief, Dimond held a series of meetings and phone

16    discussions each week from on or about April 20, 2011 through May 3, 2011, with Defendant

17    Gillis and other Board members at JP Morgan's New York offices and included Defendant T.

18    Goldberg to discuss Plaintiffs state lawsuit and what steps should they take to conceal and shield

19    JP Morgan from exposure.

20       124. Continuing on information and belief, during these same discussions, Dimond, Gillis

21    and other Unknown GC and officers talked about what steps they could have BofA and Bryan

22    Cave take to maintain JP Morgan's concealment, and after some discussions Gillis stated that

23    Bears Stearns had CFC assigned Mortgage Electronic Registration Systems (MERS), as

24    Nominee specifically because it had a policy and practice to help its "members," which Bear

25    Stearns and JP Morgan was, to conceal itself from public scrutiny as well as providing a service

26    of forging Assignment of Deed of Trust and other publicly recorded documents.

27       125. On or about April 20, 2011, based on information and belief, Defendant Gillis and

28    Unknown GC told Dimond that since Plaintiffs loans were not reassigned by CFC before it went

**FIRST AMENDED COMPLAINT**

1 | out of business in 2008, that neither JP Morgan nor MERS actually has the legal authority or
2 | right to transfer or reassign any beneficial interest and so they would have to forge an
3 | Assignment of Deed of Trust which falsely represents that MERS does have the right.

4 |     126. Continuing on information and belief, Dimond told Gillis and Unknown GC to
5 | disregard the law as it relates to assignments, and contact the necessary persons at BofA and
6 | elsewhere to be prepared to forge this document.

7 |     127. Based on information and belief, it is alleged that on or about April 21, 2011,
8 | Defendant Dimond called from his New York offices to Defendant Cecere at his office, and ask
9 | him if he and his board would be willing to accept trusteeship over Bear Stearns Trust in order to
10 | help him conceal JP Morgan's interest in it from Plaintiffs and others in exchanged for an
11 | undisclosed amount of compensation, by falsifying an Assignment of Deed of Trust of Bear
12 | Stearns Trust from Defendant Recontrust to US Bank.

13 |     128. Continuing on information and belief, Defendant Cecere then conferred with
14 | assistants and Unknown GC within US Bank about this then called Dimond back stating that he
15 | and his board would agree to accept trusteeship over Bear Stearns Trust for compensation.

16 |     129. On or about April 20, 2011, based on information and belief, Dimond told Gillis that
17 | this was the correct approach and he authorized Gillis and Unknown GC to enlist the help of
18 | MERS to forge a new Assignment of Deed of Trust to be recorded in the state of California
19 | transferring trusteeship to US Bank, per the agreement Dimond had reached with Cecere.

20 |     130. On or about April 22, 2011, based on information and belief, Defendants Gillis and
21 | Unknown GC from JP Morgan offices called Deseor at her BofA office in Los Angeles,
22 | explained to her Dimond's agreement with Cecere and asked if BofA agreed with the plan and
23 | could she take steps to have Assignment of Deed of Trust falsified so that the Bear Stearns Trust
24 | is reassigned to US Bank.

25 |     131. Deseor stated that BofA would do so and on information and belief, on or about
26 | April 2011, Unknown GC faxed and mailed Bear Stearns Trust details from JP Morgan offices to
27 | Deseor California office for implementation of Dimond's plan.

28 |

PAGE 23

**FIRST AMENDED COMPLAINT**

132. Deseor then called her contacts within MERS Virginia office, explained Dimond's and Cecere plan and informed them that BofA would be having the documents falsified and recorded assigning US Bank as trustee, including information relating to Plaintiffs mortgage, and using MERS name per practice pursuant to the agreement that BofA and JP Morgan had with MERS.

133. From its inception in the early 2000s and each and every year to 2018, MERS was founded to act as a "Strawman" for Wall Street firms who targeted Americans with fraud, and to conceal the orchestrators of the fraud from public, borrower and investor knowledge, and the practice was to permit its members to use the name of MERS as the Benificiary to cover up their involvement in fraud on borrowers and to evade county taxes and or recording fees, although it was never an actually beneficiary, but solely provided a name that appeared to be a separate entity from its members whose mission was for keeping track of mortgages.

134. Without MERS, the Plaintiffs and all other borrowers would directly know who their lenders are and be able to hold them directly responsible for the wrongdoing they hired originations like Countrywide to perform.

135. On or about April 2011, on information and belief it is alleged that BofA staff called Defendants Brooks and McCall of Los Angeles, who sometimes operated as a team to forge public documents, and asked her whether she would be willing to falsify several Assignment of Deed of Trust which would be recorded in Santa Clara County California, and other parts of the U.S., purporting that she was Assistant Secretary for MERS, in order to pretend that she had authority to transfer trusteeship of Bear Stearns Trust from Recontrust Co. to US Bank and pretend that she and MERS owned the right to reassign beneficial interests of the note to others, and that she would be compensated a certain amount for doing so which would be payable through wire transfer.

136. Upon hearing this, Defendant Brooks told BofA staff that she accepted the task, that BofA could use her and her name to pretend that she was a staff member of MERS for the purpose of making it appear that she was a bona fide employee of MERS when she was in fact not and that once they registered as a MERS employee, BofA could then fax over to her office

**FIRST AMENDED COMPLAINT**

1  all of the pertinent information of the Bear Stearns Trust information so she could have her team

2  member notarize it to which she would mail to the recording county.

3      137. On or about April 25, 2011, BofA staff in California contacted Defendant Marcus at

4  his office, and based on information and belief, explained to him Dimond's wishes to conceal JP

5  Morgan's connections to the fraudulent loans that populated Bear Stearns Trust and asked

6  whether he or any MERS officers would disagree with them hiring someone to falsify

7  Assignment of Deed of Trust to transfer trusteeships and record them in California and other

8  states.

9      138. Continuing on information and belief, it is alleged that Marcus told BofA staff that

10  this was a normal service that MERSCORP provided and that if they provided him with all the

11  names of persons whom they wished to become stand-in employees of MERS for such purposes,

12  that he would produce a corporate resolution which would list the names and give them cover to

13  use such persons to falsify and record documents for them.

14      139. BofA staff then faxed Marcus numerous names, including Beverly Brooks, and on

15  April 25, 2011, caused to be filed with the state of Delaware a Corporate Resolution which listed

16  Beverly Brooks, along with over 200 other names, as MERS officers who were in fact not so, but

17  merely persons hired by BofA et al to specifically falsify county records throughout the U.S. and

18  he called BofA, giving its staff the go ahead to falsify and record the transferring documents.

19      **MERS Had No Authority To Reassign Note To U.S. Bank**

20      140. On or about May 4, 2011, Aida Duenas, faxed from BofA South Carolina office to

21  Beverly Brooks office in California, a falsified assignment of deed of trust, which falsely

22  indicated that Beverly Brooks was a bona fide assistant secretary of MERS; that MERS had the

23  authority to transfer Bear Stearns Trust to US Bank as "nominee for Countrywide" (CFC did not

24  exist at this time and could not have directed MERS to transfer interest); that it had the endorsed

25  Note and Deed of Trust to transfer when in fact MERS did not; that MERS had beneficial

26  interest rights when it did not; that it had the authority from the holder-in-due-course to make the

27  transfer, when it did not; that its address was 3500 SW 34th ave, Ste 101 Ocala, Fl when its actual

28

**FIRST AMENDED COMPLAINT**

1  address was in Reston Virginia and that MERS was paid an unspecified amount of money to

2  relinquish interest in the Deed of Trust and note.

3      141. No permission was obtained, nor communication made, to the Plaintiffs requesting

4  their permission or otherwise giving notice of this transfer based on their being original party to

5  contract.

6      142. On or about May 4, 2011, Defendant Brooks received and reviewed BofA's fax,

7  read and acknowledged all of the falsified information contained within the forged Assignment

8  of Deed of Trust, did not have access to nor otherwise reviewed any original Note or loan

9  documents associated with Plaintiffs mortgage and signed, her name thereto and mailed it to

10  BofA California offices.

11      143. Upon receiving the forged Assignment on or about May 6, 2011 through US Mails,

12  BofA staff in California mailed it to Santa Clara County Recorder Regina Alcomendras,

13  representing that it was not a fraudulent document thereat requesting that it be recorded.

14      144. On May 12, 2011, County Recorder staff in Santa Clara recorded the falsified May

15  4, 2011, Assignment of Deed of Trust representing that US Bank was assigned as the legal and

16  legitimate trustee.

17      145. In April and May 2011, JP Morgan then sent an undisclosed amount of funds over

18  the U.S. wired banking services to BofA, US Bank, Roncontrust, MERS, Bryan Cave, itself and

19  others in order to distribute compensation to those employees and officers who contributed to

20  falsifying the Assignment of Deed of Trust and otherwise assisting to conceal its involvement.

21      146. On or about May 2011, BofA faxed Defendants Gillis and Unknown GC at their

22  offices the falsified Assignment and they delivered a copy to Defendant Dimond at his office.

23  **State Court Overrules Demurrer and State Court of Appeals Reversal**

24      147. During July 2011 finally perused the Wells Fargo discovery which evidenced Bear

25  Stearns as being Plaintiffs actual lender who had hired Countrywide to defraud them and on July

26  23, 2011, they filed an amendment to their Third Amended Complaint, which identified Bear

27  Stearns by name, replacing Doe Defendant 1.

28

**FIRST AMENDED COMPLAINT**

PAGE 26

148. Although the state court did not accept the amendment at this time, it did overrule CFC, BofA et al fourth demurrer on August 3 and 10, 2011, pertaining to conspiracy to commit fraud, and three distinct types of unfair business practice clearing the way for trial after discovery was completed.

149. On December 18, 2011, the California Court of Appeals, reversed the state court dismissal of Wells Fargo from the case, remanding it back based on the state allegations showing that Wells Fargo and its CEO conspired with BofA CEO Lewis and Countrywide's Angelo Mozilo, David Sambol et al.

150. Based on information and belief, it is alleged that during July, August and December 2011, Defendant Goldberg faxed these court documents to Defendant Gillis and BofA Unknown GC, then phoned each of them to asked them what did they wish for him to do in response.

151. On or about August 3, 2011, Goldberg spoke from his office to Gillis and Unknown GC, based on information and belief, saying that if they wished to remain concealed and evade liability of fraud, that they needed to get more aggressive with the Plaintiffs and punish them for litigating against them.

152. Continuing on information and belief, Gillis and Unknown GC asked what could they do, and Goldberg told them that since BofA was facing trial for fraud that it was no longer in a position to take meaningful actions, so JP Morgan needed to replace BofA from servicing Plaintiffs first mortgage with another company who would be willing to accept the fraudulent nature of their mortgage; accept the Pretend Trustee US Bank, be ready to disregard US debt collection laws by seeking to collect debt from Plaintiffs by threatening and intimidating them with foreclosure.

153. Based on information and belief, Defendant Gillis told Goldberg that he would present his points to Dimond and on or about August 2011, he spoke with Dimond in his office about Goldberg's positions, and Dimond then conferred with other board members and they all agreed to such and told Gillis and Unknown GC to direct staff to find a replacement for BofA.

**FIRST AMENDED COMPLAINT**

154. From August 2011 to October 2012, Gillis, Unknown GC contacted other entities, asking them to take on Bear Stearns Trust and Plaintiffs loan, but no one was willing until they communicated with Australian based Specialized Loan Servicing (Defendant SLS).

155. On or about September, October, November and December 2012, based on information and belief, Gillis and other Unknown GCs called SLS and spoke with Unknown SLS GC, explained that he was acting on behalf of JP Morgan who wished to conceal itself from liability; that the Plaintiffs are parties in federal and state cases against BofA, CFC and others, and in order to intimidate them from pursuing litigation and being witnesses therein, JP Morgan's board wished to intimidate and threaten them with foreclosure in hopes of deterring them from continuing litigation and they needed to know whether SLS would be willing to become the servicer of their mortgage and pursue debt collection that was based on falsified Assignment and other fraudulent loan documents in exchange for an agreed upon compensation.

156. Continuing on information and belief, SLS Unknown GC stated that they would communicate such proposal to Defendant Wells and on or about August 2012, the spoke with Defendant Wells at his Colorado office; explained the request and Wells scheduled talks with other board members.

157. On or about October 2012, Defendant Wells spoke with other SLS board members, based on information and belief, who each told him that he should accept the offer to service Plaintiffs loans, even though they were based on falsified information and fraud, since SLS was agreeing to service other loans which were also based on fraud and false information for compensation.

158. On or about October 25, 2012, Defendant Wells called Defendant Mckernan to his office, explained the Board's agreement to take on Plaintiffs mortgage from BofA, explained how it was based on falsified Assignment and fraud, then asked her was she willing to pursue debt on their mortgage, even though there was no legal standing of US Bank to do so, in order to intimidate and threaten the Plaintiffs with debt collection and foreclosure because of their efforts to expose the fraudulent loans in federal and state courts, for a certain amount of compensation through promotion in SLS.

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

159. On or about October 2012, Defendant Mckernan told Wells that she would accept the tasks and would take steps once the servicing was turned over to SLS.

160. On or about October 2012, Defendants Gillis and Desola, based on Dimond and Board's authorization, called-in and faxed instructions from JP Morgan and SAMI offices, to Defendants Cecere and US Bank Wisconsin offices, to assign Defendants SLS, Wells, Mckernan based on the 2011 falsified Assignment, to be the servicer of Plaintiffs mortgage.

161. Defendants Cecere and US Bank on or about November 1, 2012, faxed and mailed to Defendants Wells, Mckernan and SLS a contract for them to service Plaintiffs mortgage.

162. JP Morgan also transmitted over US wires, an unknown amount of compensation to BofA, US Bank, SLS and others to pay for their respective roles in this plan.

**Plaintiffs Gives Notice to Dimond, Gillis, Goldberg, Wells, Cecere About Fraud**

163. On or about June 2011, Plaintiffs sent letter to Dimond about the information they learned about Bear Stearns from Wells Fargo discovery, that JP Morgan was basically given its MBS for pennies on the dollar and who could they speak or communicate with at JP Morgan to discuss not only a resolution on their fraudulent loans, but settling the state and federal litigation.

164. On or about June 20, 2011, Defendant Dimond personally read a letter sent to him by the Plaintiffs which explained the entire history from March 2006 origination, falsified overcharging in the servicing and misrepresentations in the modification and their request to speak with him and or any JP Morgan employee who could speak with them in order to resolve their on-going claim so that they could get an honest modification with a prime loan as originally promised and resume their life making monthly payments and all.

165. On or about June 2011, Plaintiffs spoke with Goldberg over phone and asked him who at JP Morgan could they speak with in order to work out a solution to their fraudulent mortgage, and Goldberg told them that he was not aware of JP Morgan being involved, would check on this and get back to them with an answer.

166. Based on information and belief, it is alleged that Goldberg called from his office to Defendant Gillis and Unknown GC New York offices, talked about Plaintiffs just learning that

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

1   JP Morgan took over the mortgage from Bear Stearns and Goldberg asked Gillis what position

2   should he take and Gillis stated that he would have to confer with Dimond on this question.

3        167. On or about June 2011, based on information and belief, Gillis met with Dimond in

4   his office, explained Goldberg's statement and Dimond told Gillis to ask Goldberg to deny JP

5   Morgan's involvement and interest at all cost.

6        168. Continuing on information and belief, Gillis then called from his office to Goldberg

7   in San Francisco, asked him if he was willing to falsely lead the Plaintiffs into believing that JP

8   Morgan had no interest and therefore Wells Fargo was "Investor" and entity whom they should

9   go after who they could negotiate with.

10       169. From on or about June 2011 and each month to December 2016, Defendant

11  Goldberg repeatedly told the Plaintiffs, as well as state and federal court judges that JP Morgan

12  had no interest in their mortgage.

13       170. On or about July 2011, Plaintiffs made five attempts to reach a direct line with

14  Dimond by calling his office in New York, and on the fifth try they were routed ultimately to

15  Defendant Gillis office where they explained their plight from 2006 to 2011 and needed to speak

16  with an authorized JP Morgan employee who can settle their mortgage issues.

17       171. Based on information and belief, Gillis had already spoke with Dimond about what

18  he should tell the Plaintiffs when Gillis spoke to them and he should lead them into believing

19  that JP Morgan never had any ownership or interest in their mortgages.

20       172. Defendant Gillis told Plaintiffs during this discussion that their loans were sold off

21  to another company after the Bear Stearns acquisition and that BofA retained all rights to service

22  and negotiate any modification or settlement of their mortgage.

23       173. Defendant Gillis also told Plaintiffs that their loans were not part of JP Morgan then,

24  nor ever was a part of it or any company it owned, that JP Morgan had no financial or other

25  interest in their loan and only Wells Fargo and BofA appeared to have the interests that Plaintiffs

26  were looking for.

27       174. Based on this representation the Plaintiffs took him at his word, relied on his

28  representations which concealed JP Morgan being a behind-the-scenes player who directed the

**FIRST AMENDED COMPLAINT**

1    continued falsification and fraud of their mortgage and did not make JP Morgan a defendant in

2    their state case next to Bear Stearns.

3    **Additional Intimidation and Threats By SLS on Behalf of Dimond, Cecere et al**

4    175. From on or about March to June 2012, the Plaintiffs entered settlement talks with

5    Wells Fargo and its CEO Stumpf and settled the case with them for its role as Master Servicer

6    over their mortgage.

7    176. On or about June 2012, based on information and belief, Defendant Goldberg called

8    from his office to JP Morgan Unknown GC, explaining to them that the Plaintiffs had reached a

9    settlement with Wells Fargo and had been very aggressive in seeking discovery through him

10   from BofA, CFC et al which would directly expose JP Morgan identity through SAMI and that

11   unless they intimidated and threatened the Plaintiffs into dismissing their claims, that they ran

12   the risk of them discovering that JP Morgan was behind it all.

13   177. Continuing on information and belief, the Unknown GC asked Goldberg what action

14   could they take to threaten and intimidate the Plaintiffs from further litigation and Goldberg

15   answered that they should get aggressive with debt collection and foreclosure.

16   178. In September 2010, March, August 2011, February, June, September 2012, and

17   other times, Defendant Goldberg spoke with Plaintiffs over the phone from his office, and

18   repeatedly told them that unless they started making payments on the modification agreement,

19   dismissed their state case and appeal that he would be advising his "client" to take their property

20   away from them.

21   179. Each time that Goldberg raised this topic with them, he would always promise the

22   loss of their property and every time Plaintiffs stated that they would settle the case once they

23   were afforded the one prime loan which they were promised in 2006.

24   180. The unknown GC spoke with Defendant Gillis in his office about Goldberg's debt

25   collection suggestion and Gillis met with Dimond about this on or about November 2012 and

26   Dimond told Gillis to ask Cecere at US Bank to ask SLS to intimidate and threaten the Plaintiffs

27   with foreclosure in hopes to persuade them into dropping their lawsuit and appeal.

28

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

181. On or about December 2012, based on information and belief Defendant Gillis called Unknown GC at US Bank asking them to ask SLS to intimidate and threaten the Plaintiffs with foreclosure, and the GC spoke with Cecere in his office about doing this and Cecere told the GC that he agreed with this effort and for them to ask SLS to threaten the Plaintiffs with such.

182. On or about December 20, 2012, based on information and belief, Defendant Mckernan received a call from US Bank Unknown GC who ask her whether SLS would be okay with threatening and intimidating the Plaintiffs with foreclosure in hopes to not coerce them into making payments on the modification agreement, but to cease their litigation efforts.

183. Based on information and belief, Mckernan spoke with Wells in his office, told him the request of US Bank and asked what his instructions were for her, and Wells told Mckernan that he agreed with the request and that Mckernan should have SLS staff threaten Plaintiffs with foreclosure.

184. On December 20, 2012, based on Defendants Goldberg, Dimond, Gillis and Cecere plan, Wells and Mckernan had their subordinates mail to the Plaintiffs home a "Notice of Default and Notice of Intent to Foreclose" which was based on the falsified and or fraudulent Assignment and modification agreement which was pending on appeal and before the state court.

185. On or about December 25, 2012, Plaintiffs called Goldberg explaining that they were being threaten with foreclosure by SLS and he told them that all they had to do was to start making payments on the modification and drop the litigation and the threat would go away.

186. The Plaintiffs told Goldberg at this time that they would only start making payments once his client corrected the fraud that occurred from 2006 to 2009 by providing them the originally promised one (1) prime loan with promised monthly payment to replace the two sub-primes that they were attempting to enforce and they had a right to pursue claims in court.

187. Goldberg then told the Plaintiffs that they did not have a right to such loan or the right to bring "frivolous" cases against his clients.

188. From January to September 2013, Defendant Goldberg instructed JP Morgan and SLS, based on information and belief, to pursue Plaintiffs for debt collection by speaking with Gillis and Mckernan in their respective offices saying that pursuing debt collection was deterring

**FIRST AMENDED COMPLAINT**

1    the Plaintiffs from being effective in their discovery attempts and it should be maintained while
2    he and assistant Tom Lee will get more aggressive in fighting their discovery request by
3    presenting false information to the court.

4    189. From January to May 2013, Defendant Goldberg repeatedly told the Plaintiffs and
5    the court that they had provided Plaintiff all of the information relevant to the case, that there
6    was no information about Bear Stearns or any other entity which owned their loans, that they
7    needed to simply dismiss their case and appeal, make payments on the modification and move
8    on.

9    190. On or about September 13, 2013, Goldberg faxed the opinion by the California
10   Court of Appeals to Gillis and Dimond, which reversed the state court dismissal of BofA and K.
11   Lewis from the case and held that the allegations met all legal standards showing they conspired
12   with Bear Stearns, Wells Fargo et al.

13   191. On or about July 16, 2014, Goldberg faxed the opinion of the 9th Circuit to Gillis
14   and Dimond, which reinstated the Plaintiffs federal case back in district court.

15   **Plaintiffs Pursue Right to Become Party & Witness In State Court Action**

16   192. The Plaintiffs never wished to bring litigation against anyone about their loan, but
17   once they discovered the fraud that was committed by CFC and learned that CFC was actually
18   hired to steer them into a subprime loan, versus the prime that they qualified for, coupled with
19   the fact that BofA kept misrepresenting first itself then Wells Fargo as the funder, they had no
20   choice but to litigate.

21   193. There were dozens of lawyers willing to take on their initial litigation; however,
22   they were quoted $300,000 to a million and decided against it since they were willing to settle
23   the case either for honest modification of the loans into one prime, or $200,000 and so they
24   exercised their right to prosecute defendants for their wrongdoing.

25   194. From December 2009 to March 2010, BofA staff contacted the Plaintiffs over the
26   phone and by mail on four occasions at their home with threats of foreclosure unless they made
27   payments to it on the fraudulent mortgage, which they were contesting in court.

28

PAGE33

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

195. When the Plaintiffs explained that the issues were under litigation and that they were appealing, an Unknown BofA staff told them that their "legal counsel has given us clearance to pursue debt collection action against you now."

196. The Plaintiffs also again wrote communique to BofA's CEO Lewis in December 2009, informing him about his staffs threats to take away their property, asking him either settle their claims by providing them with the originally promised one (1) loan on their property with monthly payments peri-$2,200; or, $200,000 in exchange for their property; or, to cease and desist from further debt collection actions until federal litigation was fully resolved.

197. Based on information and belief, it is alleged that Lewis faxed the communique to JP Morgan's Board in New York, in or about December 2009, which was headed by Defendant Dimond, and Dimond discussed Plaintiffs request with other members who collectively decided to not settle the claims, but to attack and threaten them in whatever way they could.

198. On December 22, 2009, the Plaintiffs commenced a state of California action and effected service upon BofA et al in North Carolina and elsewhere, who in turn faxed and mailed copy to JP Morgan Unknown GC in New York from BofA'a North Carolina offices on or about January 2010.

199. Unknown GC received this state lawsuit at JP Morgan's New York Offices then faxed and emailed it over to JP Morgan's Unknown Liaison officer on or about January 2010, who interfaces between the Board and GC office, who in turn presented a synopsis of Plaintiffs claims to Defendant Dimond and other Board member(s) for consideration.

200. The Plaintiffs state case set forth information which identified Bear Stearns, only as Doe Defendants 1-20, as the culprits who conspired with Angelo Mozilo and CFC to originate their fraudulent mortgages that were intentionally designed to trick prime borrowers like the Plaintiffs, into subprime loans, conceal terms from them in order to strip them of income, savings, equity before producing default then foreclosure.

201. Based on information and belief, it is alleged that once Dimond became aware of Plaintiffs state lawsuit, he consulted with Unknown GC in January, February, March, April, May, June and July 2010, where they met in his New York office and spoke over the phone, on

**FIRST AMENDED COMPLAINT**

ways that they could use JP Morgan's corporate structure to obstruct the Plaintiffs from testifying or otherwise bringing their claims before a California jury; how to conceal JP Morgan involvement in the fraudulent mortgages and force them to either submit to the fraudulent modification by making payments or to give up their property.

202. Continuing on this information and belief, Defendant Dimond and Unknown GC agreed during these meetings that it was best to cover-up the fraudulent practices that Bear Stearns, CFC and others committed against the Plaintiffs because doing so may alert state and federal governments that most of the loans which Bear Stearns placed in its mortgage backed securities was populated with fraudulent mortgages which would have to be nullified or at best modified into lower yielding prime loans.

203. Based on information and belief, Defendant Dimond directed Unknown GC, on or about January 2010, to have Defendant Bryan Cave to do whatever it could to deter by force, intimidation or threat, the Plaintiffs into not testifying or otherwise exposing the fraud that they experienced in any court in exchange for some agreed upon compensation.

204. The Unknown GC then faxed and emailed Bryan Cave who then assigned Defendant Goldberg to head up the defense in state court.

205. On information and belief, it is alleged that on or about January 2010, the Unknown GC called from JP Morgan's New York office to Defendant Goldberg in San Francisco, explaining to him the Board's wish to obstruct the Plaintiffs from testifying, being a witness or succeeding as a party in court on the claims they raised in their state case, and that if Goldberg and Bryan Cave as a whole was successful in obstructing them through force, intimidation or threat, that JP Morgan would compensate Bryan Cave and Goldberg an untold amount of money.

206. Continuing on information and belief it is alleged that the Unknown GC instructed Goldberg to also do whatever it took to conceal JP Morgan's and Dimond's identities and involvement in their mortgage and to falsify information to whatever court he had to in order to achieve such concealment.

**FIRST AMENDED COMPLAINT**

207. During this phone call, Defendant Goldberg agreed to do all that he could to obstruct the Plaintiffs succeeding on their claims and conceal JP Morgan's and Dimond's involvement therein.

**Defendants Goldberg & Bryan Cave's Concealment & Misrepresentations to Court**

208. From on or about March 2009 to April 2010, Defendants Goldberg, Unknown GC, Dimond and others, reviewed Plaintiffs loan documents, the Deed of Trust and other related documents, at JP Morgan's and Bryan Cave offices at least once per week and learned of every action Bear Stearns took in hiring CFC to defraud the Plaintiffs and also learned that they were not in position of the mortgages Endorsed Notes, that Assignment Deed of Trust was falsified and there was no legal standing for them to enforce payment of mortgage since they were based upon fraud.

209. After Defendants made their appearance through Bryan Cave, Goldberg et al, the Plaintiffs called Goldberg at his office to discuss discovery schedule and sought to work things out amicably.

210. In March, April, May, June, July, August and October 2010, the Plaintiffs contacted Goldberg with discovery requests, which sought not only evidence of the fraud committed by CFC and Bear Stearns, but the identities of Bear Stearns, JP Morgan et al.

211. Defendant Goldberg called from his office in each of these months to Unknown GC in New York, during each of these months, told them about Plaintiffs requests and informed them that if they provided the information to them, that he would not be able to conceal JP Morgan's involvement nor the fraud that was committed against them.

212. Unknown GC, communicated these things to Defendant Dimond who each time instructed Unknown GC to tell Goldberg to continue to conceal evidence from the Plaintiffs and do all he could to intimidate and threaten them.

213. Defendant Goldberg, on or about February, March, as well as in April 2010, pursuant to agreement with Dimond, Gillis and others, told the Plaintiffs, through phone calls in these months, that they were not entitled to discovery until the court ruled on demurrer that he was filing in April, which he did.

**FIRST AMENDED COMPLAINT**

214. On or about August 2011, the state court overruled Goldberg's fourth demurrer, ordering for fraud and unfair business practices to move forward to discovery and based on information and belief, Goldberg called Gillis at his office asking him whether Dimond wanted him to continue to conceal JP Morgan's involvement in Plaintiffs mortgages, or continue to conceal such from them.

215. Continuing on information and belief, Gillis called Dimond and asked him Goldberg's question and Dimond told him to tell Goldberg to continue the concealment and Gillis called Goldberg back on or about August 2011, telling him to continue.

216. From 2006 to circa October 2008, Countrywide and BofA represented to Plaintiffs that they were the Creditors of fraudulent mortgages; was then told in October 2008 that Wells Fargo was in fact the true creditor.

217. In both the Federal and State court cases, filed March and December 2009, the Plaintiffs relied on these misrepresentations in drafting their lawsuits which named Wells Fargo as a chief co-conspirator with CFC, BofA, Does 1-100 et al.

218. After the state court in 2010 ordered Wells Fargo to provide certain discovery were the Plaintiffs provided with the first proof that Bear Stearns was the actual creditor that funded their loans and orchestrated CFC et al fraudulent practices against them.

219. Throughout 2009, 2010, 2011, 2012, 2013 and 2014, the entire life of the initial federal case and state case, Defendant Goldberg reviewed information which showed Bear Stearns hiring Mozilo of CFC to defraud the Plaintiffs by falsifying loan documents to reflect that they agreed to a first and second mortgage, when they did not; that they were promised one prime loan with payments between $2,200 and $2,800; that they actually qualified for a prime loan, but upon instructions of Bear Stearns was steered into subprime; that JP Morgan was aware of the fraud in the origination and the overcharging of fees in monthly payments from 2006 to 2009 and that it was JP Morgan who directed BofA to promise Plaintiffs a modification which would be one prime loan, but to actually produce two subprime loans.

220. In each of these years from 2009 to 2014, Defendant Goldberg intentionally falsely wrote and told the state and federal courts that there was no evidence of Bear Stearns and JP

**FIRST AMENDED COMPLAINT**

1  Morgan's involvement, that he had turned over all documents within their care and control to

2  Plaintiffs and that the allegations were essentially a figment of their imagination.

3      221. It is alleged that Goldberg made all of his false representations to the state and

4  federal courts pursuant to the instructions of defendants Gillis, Dimond, Wells, Mckernan,

5  Cecero, Costango, Desola, Marcus and others.

6      222. On or about July 2014, when Goldberg communicated to his "clients" that the 9th

7  Circuit was about to publish a reversal in the federal case he received calls from them at his San

8  Francisco office complaining about the opinion and they asked him to open up settlement talks

9  with the Plaintiffs.

10      223. On information and belief, Goldberg told Gillis, Dimond, Wells and the others that

11  he would advise against settlement with the Plaintiffs because it would set a precedent which

12  may open JP Morgan up to liabilities from others and that they needed to give him more time to

13  obstruct Plaintiffs prosecutions.

14      224. Continuing on information and belief Goldberg asked Gillis, Dimond, Wells and the

15  others whether he was authorized by them to present false evidence to the courts in order to

16  hinder and hopefully get the Plaintiffs cases dismissed from state and federal courts and Gillis

17  told him yes, Dimond told him yes, Wells told him yes, Cecere told him yes, Mckernan told him

18  yes.

19      225. On or about July 15, 2014, Goldberg produces a motion for judgment on the

20  pleadings in which he presented falsified information that Plaintiffs filing of state case in

21  December 2009 was beyond the statute of limitations period for filing, although it was tolled

22  pending 9th Circuit appeal, and that their signing of the modification contract was their

23  agreement to waive the 2006 to 2009 fraud that was committed by his clients.

24      226. On January 20, 2015, Goldberg filed a motion to dismiss in federal case which

25  presented falsified facts that Plaintiffs waived the 2006 to 2009 fraud claims when they signed

26  modification, that they were not prime loan candidates, that all allegations against his clients

27  were imagined and fabricated.

28

**FIRST AMENDED COMPLAINT**

227. Goldberg was able to convince both courts to dismiss Plaintiffs cases on falsified information and they are both pending appeal.

**JP Morgan, SAMI & Bryan Cave Resumens Debt Collection to Threaten and Intimidate**

228. Based on information and belief, Plaintiffs alleges that on or about November 2016, James Goldberg, on behalf of and in the name of Bryan Cave, placed a call from his San Francisco office to Defendant Gillis and other and informed them that he believed that since he was successful in obstructing Plaintiffs state and federal case that, they are still trying to pursue them through appeals and may very well succeed again, and he believed that it was now time for JP Morgan to threaten and intimidate Plaintiffs with debt collection in a more forceful way to not only intimidate and threaten them but as punishment for being so tenacious on their claims and for refusing to dismiss their cases against these and other defendants in state and federal courts.

229. Continuing on information and belief, Defendant Goldberg explained to this Gillis and others that there was a chance that the 9th Circuit and State Court of Appeals would be again reversing the lower courts dismissals; that he, Goldberg and been trying to persuade the Merritts in each year from 2010 to 2017 to either make payments on the 2009 modification or turn over the property to the servicer, but they have refused and therefore he, Goldberg believed that foreclosure was the only alternative that JP Morgan had to coerce them into either giving up on litigation; make arrangements to make payments to SLS; file for bankruptcy or sell the home which would achieve the objective of stripping the equity out of their property or stripping them of the property altogether, and Gillis told him that he would confer with Dimond to get approval on this plan.

230. On or about December 2016, Gillis spoke with Dimond in his office, explaining Goldberg's idea to threaten and intimidate Plaintiffs by actually pursuing foreclosure against them versus merely threatening them with such and Dimond told Gillis that he agreed with this idea, then told Gillis for him and other Unknown GCs implement the idea by contacting US Bank, SAMI and SLS counterparts asking each if they would do this for JP Morgan in exchange for certain compensation.

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

231. On or about December 2016, Gillis called from his office to Unknown GC at US Bank offices, asking whether they would go along with this idea of Goldberg and foreclosure against the Plaintiffs on the falsified Assignment and fraudulent mortgage and the Unknown GC called Cecere in his office posing the idea and question.

232. Continuing on information and belief, Cecere told the Unknown GC in December 2016, in his office that he agreed with the idea and to inform Gillis to tell Dimond that he would initiate foreclosure proceedings against the Plaintiffs based on the falsified Assignment and fraudulent mortgage; but he informed Dimond that MERS did not actually have the authority to transfer trusteeship to US Bank in 2011, not only because the Note was destroyed to cover up past fraud, but because CFC did not exist in 2011 and MERS was only the nominee without any interest in Plaintiffs mortgage.

233. Continuing on information and belief, On or about December 20, 2016, Gillis was informed about the defects in the falsified assignment of May 2011 and he called Dimond in his office, explained it to him and talked about what they should do.

234. On information and belief, it is allege that on or about December 20, 2016 Defendants Dimond and Gillis held a meeting in their offices with Defendant Costango explaining the problem with the May 2011 falsified Assignment and asked what would be a course of action they could take in order to give the appearance that SAMI had a legitimate basis to foreclose on Plaintiffs home.

235. Continuing on information and belief, it is alleged that during this meeting Costango and Gillis told each other that they could have recorded in Santa Clara a Substitution of Trustee that falsely records that MERS was a nominee for any successor and beneficiary produce a new assignment of trustee asked if he could have Defendant Costango as President of SAMI have SLS falsify on behalf of US Bank, a substitution of trustee and hope that it would be sufficient to dupe any California judge and official, including Plaintiffs, during the foreclosure process.

236. From this meeting, continuing on information and belief, Dimond, Costango and Gillis agreed to do this and Dimond called Cecere on or about December 21, 2016, asking him

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

1   whether he would allow SLS to substitute US Bank for another trustee so they could file a new

2   recording that seeks to legitimize SAMI's position to foreclose.

3       237. Defendant Cecere told Dimond that he agreed and gave permission to SLS to falsify

4   a Substitution of Trustee naming who they wished to act in US Bank's stead to distance JP

5   Morgan and US Bank from the fraudulent loans as well as to cover up the falsification of May

6   2011 Assignment which did not convey authority to MERS to reassign mortgage and other false

7   information therein.

8       238. On or about December 2016, based on information and belief, Cecere made a call

9   from his office to Defendant Wells office, explained Goldberg's idea to Wells then asked

10   whether he could use SLS to initiate foreclosure proceedings against the Plaintiffs, but to exclude

11   US Bank from the process, since they did not wish to get tied up in a foreclosure which was

12   based on falsified Assignment and fraudulent mortgage.

13       239. Defendant Wells told Cecere, based on information and belief, that under the

14   agreement between US Bank and SLS, their compensation covered such assistance and he would

15   have his SLS staff forge such a substitution and that he would see to it that foreclosure

16   proceedings were commenced and to distance US Bank from it by having another debt collector

17   he knew.

18       240. On or about December 21, 2017, Wells then made a call from his office to

19   Defendant Steele at his California office, told him all the details about Goldberg's idea,

20   explained how the debt that they would be seeking foreclosure on was based on falsified

21   information recorded in the 2011 Assignment and fraudulent loans from 2006, that US Bank

22   wanted to not only distance itself from the transaction, but he and his collection company would

23   have to be willing to not verify whether US Bank actually had the authority to appoint a

24   substituted trustee and overlook the fact that there was no actual endorsed Note showing the

25   assignments and ignore the fact that MERS did not have any authority in May 2011 to even

26   reassign the Deed of Trust simply as a nominee without any interest, particularly since CFC did

27   not exist at the time.

28

PAGE 41

**FIRST AMENDED COMPLAINT**

241. Defendant Steele told Wells that his company agreement with SLS and contractual compensation, did in fact cover foreclosures all the time, which were based on falsified information in recordings and otherwise involved fraudulent mortgages and that as long as SLS paid them the agreed upon fee as compensation, that he would use Zieve Brodnax & Steele and its debt collection staff to implement this plan.

242. Based on information and belief, Wells assured Steele that he and his company would be fairly compensated for doing this.

243. Right after this discussion and agreement, Defendant Wells spoke with Mckernan in his office, explained Goldberg's idea to threaten and intimidate Plaintiffs, Steele's agreement and then asked whether she would be willing to have SLS staff produce a substitution of trustee naming Zieve Brodnax & Steele in order to have them foreclose on the falsified Assignment and fraudulent loans.

244. On or about December 22, 2016, Defendant Mckernan told Steele, based on information and belief, that she agreed to implement the plan and thereat she meet with Defendant Ward in his office, explaining Goldberg and Dimond's plan and ask if he were willing to falsify a Substitution of Trustee to give the appearance that he was a legitimate employee of US Bank making the substitution; portraying US Bank as a legitimate trustee for the Bear Stearns trust, although it was not, and substitute Zieve Brodnax & Steele in its place so that he, Mckernan and Wells can have them foreclosure on Plaintiffs property in order to punish them for their litigation.

245. Continuing on information and belief, Defendant Ward told Mckernan that he agreed to do this as long as he was fairly compensated and she told him that he would be.

246. On or about December 27, 2016, Defendants Ward and Mckernan met in SLS offices and typed up a Substitution of Trustee in order to conceal the lack of authority that MERS had in 2011 when Dimond, Gillis, Brooks et al had forged and recorded Assignment of Deed of Trust, and when they completed drafting it, Ward signed it as a paid employee of US Bank, without every reviewing or authenticating any of the documents he was purporting to substitute trustee for, and without him actually being a paid employee of US Bank.

**FIRST AMENDED COMPLAINT**

247. Defendants Ward and Mckernan, then presented this falsified Substitution of Trustee to Notary Jennifer Cox of Colorado who did not see nor confirm any of the documents that they were purporting to substitute trustee for.

248. In order to threaten and intimidate them as punishment for pursuing their litigation January 2017 Defendant Dimond to October 2017, Defendants JP Morgan, SAMI, SLS, US Bank, Zieve, Steele, Brodnax, Busby, Bryan Cave through their respective officers Defendants Dimond, Goldberg, Mckernan, Ward, Desola, Costango, Wells, Cecere, Steele and defendants who are currently unknown, communicated from their respective business offices with one another through the telephone, emails, faxes in order to devise a planned to conspired to threaten and intimidate the Plaintiffs into paying an unlawful debt (produced through falsification of county records) by presenting Plaintiffs with a claim to collect debt based on an assignment of deed of trust which was falsified in May 2011; a fraudulent modification agreement which is void as of February 2009 and produced by fraud as well as the December 2016 substitution of trustee.

249. From on or about January 2017 to August 15, 2017, Defendants JP Morgan directed US Bank to target the Plaintiffs for debt collection by directing Wells and SLS to resume sending notices to them for payment of mortgage which CFC and BofA waived standing on to collect after eight years of Plaintiffs refusing to make payments until they corrected the fraud which was committed against them and provide one prime loan.

250. On or about June 2017, Plaintiffs after Plaintiffs were contacted by SLS staff that they owed debt and they replied by explaining that they did not owe them any debt, that only BofA or Bear Stearns had been known to them as the creditors and now BofA was claiming it no longer held any interest in the first mortgage, as well as notifying Defendants SLS that the issues were pending in California Court of Appeals and 9th Circuit, SLS Unknown Staff informed Mckernan, Ward and Wells of Plaintiffs response who in turn contacted Defendants Dimond and Cecere with this news.

251. On or about June 2017, on information and belief, Defendants Dimond, Gillis, Costango and Desola met in JP Morgan's offices and discussed the Plaintiffs rejection of SAMI

**FIRST AMENDED COMPLAINT**

standing to collect the debt and they told one another that they should have their agents threaten

them with foreclosure in order to compel them to either pay the falsified interest of peri-

$400,000; or sell their home to pay off the entire fraudulent amount of peri-$1,000,000 or to take

their property from them.

252. On or about July 2017, Defendants Dimond, Desola, Gillis and Costango, then

called Wells at his office and asked him to implement the plan of foreclosure upon the Plaintiffs

and at this time, Wells told them that he would and he then asked Mckernan and Ward to contact

Defendants Steele and Zieve to take the steps needed to coerce debt collection or to foreclose.

253. Based on information and belief, on or about August 15, 2017, Defendants Wells,

Ward and Mckernan mailed to Zieve, Steele and Busby the falsified Substitution of Trustee that

they had forged in December 2016 then called them asking whether they could record it with

Santa Clara County then file notice of foreclosure therefrom in order to threaten and intimidate

Plaintiffs into paying the falsified debt JP Morgan is trying to get them to pay, or strip Plaintiffs

property from them if they refuse.

254. Defendants Steele, Zieve and Busby told Wells, Ward and Mckernan that they

would agree to pursue the debt and potential stripping Plaintiffs of their property as long as they

were fairly compensated as agreed for doing foreclosures which were based on falsified

information.

255. Defendants Steele, Zieve and Busby met on or about August 15, 2017, and talked

about SLS request for them to pursue debt from Plaintiffs by way of threatening and pursuing

foreclosure, and they reviewed the documents that were mailed them and on information and

belief it is alleged that they recognized that the May 2011 Assignment did not legitimately assign

trusteeship to US Bank, that it was a falsified instrument, therefore the substitution of trustee

would be based on a fraudulent recording, but they concluded that since they had a contract with

SLS and would be fairly paid for recording the false substitution and foreclosing, that they

should pursue the case against the Plaintiffs.

256. On or about August 15, 2017, Defendants Steele, Zieve and Busby met in their

offices then produced a Notice of Default and Election to Sell Under Deed of Trust, which was

PAGE 44

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

1   entirely based on the falsified May 2011 Assignment, fraudulent 2009 modification and loan

2   documents of 2006 and asked Busby to sign it as Trustee Sale Officer.

3       257. Busby agreed and he signed it while knowing they were pursuing a debt collection

4   via foreclosure that is based upon fraud and falsified information

5       258. On or about August 15, 2017, Defendants Steele, Zieve and Busby mailed the

6   December 27, falsified substitution and Notice of Default to Santa Clara County Recorder

7   Regina Alcomendras, with payments and instructions record them in county records and , SLS

8   directed their debt collecting foreclosure mill, Defendants Zieve, Steele, Brodnax & Busby to

9   initiate foreclosure proceedings against the Plaintiffs property based on the falsified information

10  in May 2011 assignment and the void modification agreement.

11      259. Defendant Dimond, through JP Morgan corporate authority, based on information

12  and belief, entered into secret agreements in each year 2008, 2009, 2010, 2011, 2012, 2013,

13  2014, 2015, 2016, 2018 and 2018, with SAMI, Bryan Cave, BofA, US Bank, MERS, SLS and

14  other businesses to conceal JP Morgan, its board and employees from being identified as having

15  involvement in fraudulent mortgages and to support the falsification of county recorded

16  instruments in order to strip income, savings, equity and property from those borrowers, as the

17  Plaintiffs, who CFC and Bear Stearns had defrauded; as well as to evade liability for such

18  fraudulent activities.

19  **COUNT I**

20  **ACCOUNTING**

21      Plaintiffs adopts and incorporates herein paragraphs 1 to 259 as if they were fully set

22  forth herein.

23      260. Defendants have secretly and fraudulently made it appear in public records that JP

24  Morgan has no interest in Plaintiffs mortgage and orchestrated for SAMI to hold itself out as the

25  actual "Creditor" which is a wholly owned subsidiary of JP Morgan. As a result of this concealed

26  relationship, JP Morgan has a duty to Plaintiffs to publicly acknowledge itself as the actual

27  Creditor, make any claims itself regarding monies owed it by Plaintiffs and otherwise

28  communicate openly and honestly.

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*

261. The amount of money paid by Plaintiffs and claimed to be owed by them is unknown and cannot be determined without an accounting from the actual, not pretended, Creditor who is the holder-in-due-course.

262. JP Morgan should be ordered to provide a full written accounting of all sums allegedly due under the terms of the alleged original written contract, its proof of ownership of such Note/mortgage, an explanation of each amount due, and an accounting of all sums allegedly paid from alleged Servicers to JP Morgan on the alleged debt.

## COUNT II

## VIOLATION OF THE FEDERAL UNFAIR DEBT COLLECTION PRACTICES

Plaintiffs adopts and incorporates herein paragraphs 1 to 262 as if they were fully set forth herein.

263. Each of the Defendants conduct was willful or negligent or both, rendering them each liable for attempting to collect fees, interest, and expenses from Plaintiffs which are not authorized by any agreement or permitted by law in violation of 1692(f)(1).

264. Defendants conduct was willful or negligent or both, rendering it liable for failing to cease collection of an alleged debt, and not providing proper verification of the debt to the Plaintiffs prior to filing Notice of Default and Intent to Sale, in violation of 1692g(b).

265. As a result of the foregoing violations, each named defendant are respectively liable for actual damages, including general damages and special damages in an amount to be proven at trial, but not less than $2,000 per defendant, pursuant to 15 USC § 1692(k)a1.

266. As a result of the foregoing violations, each named defendant are respectively liable for actual damages, including general damages and special damages in an amount to be proven at trial, but not less than $1,000 per defendant, pursuant to 15 USC § 1692(k)a2a.

267. As a result of the foregoing violations, each defendant should be enjoined from employing any of the unlawful conduct, methods, acts, or practices under the FDCPA that is alleged herein or proven at trial.

268. An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties under the FDCPA. A judicial declaration pursuant

**FIRST AMENDED COMPLAINT**

1  to CCP 1060 that Defendants actions violated FDCPA is necessary so that all parties may
2  ascertain their rights and duties under the law.

3   269. Based on the allegations herein, each named defendant has violated 15 USC § 1692d
4  by engaging in conduct the consequence of which was to harass, oppress, or abuse Plaintiffs,
5  without limitation: continuing to pursue collection of disputed and unverified debt; disputed
6  ownership of debt; filing notice of default on invalid debt; forcing Plaintiffs to defend against
7  invalid debt, and defendants knew or should have known that they have engaged in such
8  conduct, and the consequences thereof.

9   270. Defendants, through SLS, communicated credit information to persons, including
10  but not limited to credit reporting bureaus or agencies, with respect to Plaintiffs, which it knew
11  or should have known to be false, including without limitation allegations that Plaintiffs owed
12  the purported debt which is the subject of this action and or they still owe such debt to SAMI.

13   271. Each of the defendants have, in violation of 15 USC § 1692e(8) failed to
14  communicate to Plaintiffs, other persons and entities, including credit bureaus, and persons yet to
15  be determined, that Plaintiffs disputes the alleged debt.

16   272. By falsely representing that SAMI or SLS is either an assignee of an original
17  creditor, and or that said assignment constitutes a proper, competent or valid assignment between
18  any of the defendants and the original creditor of any alleged debt by any alleged original
19  creditor to SAMI, each of these defendants have made material false and misleading
20  representatons, and has further communicated to Plaintiffs and other persons credit information
21  which is known or which should be known to be false, including the above, the failure to
22  communicate that a disputed debt is disputed, the false and misleading representation and
23  impression that Defendants is the creditor of said debt, and other material false and misleading
24  representations, and has violated 15 USC §§ 1692e, 1692e(8), 1692e(2)(A), 1692e(5), 1692e(10)
25  and 1692f. Each of these named Defendants knew or should have known all of the above.

26                          **COUNT III**
27              **VIOLATION OF RICO 18 U.S.C. § 1962(c)**
28   Plaintiffs adopt and incorporate and reallege paragraphs 1 to 272 above as if they were

**FIRST AMENDED COMPLAINT**

PAGE 47

1  fully set forth herein.

2       273. This CLAIM for relief is pursuant to 18 U.S.C. § 1962(c).

3       274. As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or

4  participating directly or indirectly in the conduct of, the affairs of the JP Morgan-SLS Enterprise

5  through a pattern of racketeering.

6       275. This Enterprise was formed by JP Morgan and SLS board of directors to achieve the

7  aims alleged herein.

8       276. The conspiracy the subject of this action has existed from date of application to the

9  present, with the injuries and damages resulting therefrom being continuing.

10       277. Defendants' actions and use of multiple corporate entities, multiple parties, and

11  concerted and predetermined acts and conduct specifically designed to defraud Plaintiff

12  constitutes an "enterprise", with the aim and objective of the enterprise being to perpetrate a

13  fraud upon the Plaintiff through the use of intentional nondisclosure, material misrepresentation,

14  and creation of fraudulent loan documents.

15       278. Each of the named Defendants is an "enterprise Defendant."

16       279. As a direct and proximate result, Plaintiffs have been injured in their business or

17  property by the predicate acts which make up the Defendants' patterns of racketeering activity.

18       280. Specifically, Plaintiffs have been injured in their business or property in a variety of

19  ways, including but not limited to, reduced credit rating, loss of wages, loss of corporate

20  earnings, health, and other ways which shall be proven at trial.

21  **COUNT III**
**VIOLATION OF RICO 18 U.S.C. § 1962(d) BY**

22

23  **CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)**

24       Plaintiffs adopt and incorporate and reallege paragraphs 1 to 280 above as if they were

25  fully set forth herein.

26       281. This CLAIM for relief arises under 18 U.S.C. § 1964(c).

27

28                                                              PAGE 48

**FIRST AMENDED COMPLAINT**

282. In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Bear Stearns-Countrywide Enterprise.

283. As a direct and proximate result, Plaintiffs have been injured in their business or property by the predicate acts which make up the Defendants' patterns of racketeering.

284. Specifically, Plaintiffs and Class members have been injured exactly as set for in paragraph 280.

### COUNT IV

**Fraud/Intentional Misrepresentation-Against All Defendants**

**Under California, Colorado, Wisconsin, New York Laws**

Plaintiffs adopt and incorporate and reallege paragraphs 1 to 284 above as if they were fully set forth herein.

285. The subject debt does not have any legitimate holder-in-due course, or the actual holder refuses to make themselves known publicly out of fear that they shall be held liable for the fraud that has been a subject of it.

286. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

287. Defendants disguised the transaction to create the appearance of the lender being a properly chartered and registered financial institution authorized to do business and to enter into the subject transaction when in fact the real party in interest was not disclosed to Plaintiff, as aforesaid, and neither were the various fees, rebates, refunds, kickbacks, profits and gains of the various parties who participated in this unlawful scheme

288. Said real party in interest, i.e., the source of funding for the loan and the person to whom the note was transmitted or eventually "assigned" was neither a financial institution nor an entity or person authorized, chartered or registered to do business in this State nor to act as banking, lending or other financial institution anywhere else

**FIRST AMENDED COMPLAINT**

289. As such, this fraudulent scheme, (which was in actuality a plan to trick the Plaintiff into paying on a debt which the perpetrators do not own interests in and used to sell unregulated securities under fraudulent and changed terms from the original note) was in fact a sham to use Plaintiff's interest in the real property.

290. Under Applicable Law Plaintiff are also entitled and demand a permanent injunction be entered against the Defendants (a) preventing them from taking any action or making any report in furtherance of collection on this alleged debt which was usurious, as aforesaid (b) requiring the records custodian of the county in which the alleged mortgage and other instruments are recorded to remove same from the record, (c) allowing the filing of said order in the office of the clerk of the property records where the subject property, "Loan transaction" and any other documents relating to this transaction are located.

## COUNT V
## VIOLATION OF THE UNIFORM COMMERCIAL CODE

Plaintiffs adopt and incorporate and reallege paragraphs 1 to 290 above as if they were fully set forth herein.

291. This CLAIM for relief arises under UCC laws whereby any financial instrument which is used in securities must be free of fraud and the assignment of deed of trust must be accompanied by the Blue Inked original Endorsed Note.

292. Defendants stand in violation of such.

## COUNT VI
## UNJUST ENRICHMENT

Plaintiffs adopt and incorporate and reallege paragraphs 1 to 292 above as if they were fully set forth herein.

293. Defendants' deceptive scheme unjustly enriched Defendants, to the detriment of the Plaintiffs, by causing Defendants to receive excessive monetary payments from Plaintiffs fraudulent mortgage(s). Specifically, Defendants JP Morgan, Dimond and board paid less than $100 for Plaintiffs mortgages, have used their mortgages to take annual tax write offs, were not the original funders of the loans, have failed to notify the original market investors that they were

**FIRST AMENDED COMPLAINT**

still pursuing collection from payments; there does not exist any original investors who provided CFC the funds for Plaintiffs property involved in the collection or knowledge of the loans.

294. Plaintiffs assert that they would only owe payments to the actual investors of their loans that Bear Stearns defrauded investment dollars from.

295. Defendants' retention of funds paid by Plaintiffs violates the fundamental principles of justice, equity, and good conscience. Accordingly, Defendants should be ordered to return any funds obtained as a result of their deceptive scheme upon the Plaintiffs to the actual investors who provided Bear Stearns funds and put the Plaintiffs in touch with them.

## COUNT VII

### Violation of 42 USC § 1985(2)

Plaintiffs adopt and incorporate and reallege paragraphs 1 to 295 above as if they were fully set forth herein

296. By virtue of the foregoing, Defendants and two or more of them, conspired for the purpose of depriving Plaintiff of (a) equal protection of the law; and (b) equal protection and immunities under the law; and for the purpose of preventing and hindering the constituted authorities from giving and securing to Plaintiff equal protection of the law an deprivation of liberty and property without due process of law.

297. Defendants, and each of them, did and caused to be done, an act or acts in furtherance of the object of the conspiracy, whereby Plaintiff was deprived of the rights and privileges as set forth above.

298. As a direct proximate result of the foregoing, Plaintiff has been damaged as recited above and demands and is entitled to the damages recited in the First Cause of Action, including, but not limited to, general and punitive damages.

## COUNT VIII

### (VIOLATION OF 42 U.S.C. § 1986)

### (By Plaintiff Against All Individual Defendants)

299. Commencing from May 2011 to January 2018, Defendants, and each of them knew and understood Plaintiff was being subjected to a deprivation of his constitutional rights and

**FIRST AMENDED COMPLAINT**

1   were in the position and had the duty and authority to intervene to prevent the wrongdoing

2   committed against Plaintiffs by Defendants.

3       300. By virtue of the foregoing, Defendants, and each of them, violated 42 USC § 1986.

4       301. As a direct and proximate result of the foregoing, Plaintiffs have been damaged as

5   cited herein and demands and is entitle to the damages recited herein and according to proof at

6   trial.

7   **PRAYER**

8       302. WHEREFORE, Plaintiffs prays judgment against Defendants and each of them, as

9   follows:

10       As to each cause of action as applicable

11       303. For General damages according to proof;

12       304. For Special damages according to proof;

13       305. For Punitive damages as provided by law, in an amount to be proved against each

14   individual Defenant;

15       306. For Cost of suit;

16       307. For such other and further relief as the Court may deem proper.

17   We, David Merritt and Salma Merritt hereby declare under the penalties of perjury that the

18   foregoing is true and correct to the best of our knowledge and belief. Pursuant to 28 USC § 1746.

19       Respectfully submitted,

20   Dated: January 12, 2018

21                   David Merritt       Salma Merritt

22

23   I M. Stuks certify that I Sent foregoing to Bryan

24   Cave on 1-12-18 at 3 Embracdero San Francisco Cal

25

26

27

28

**FIRST AMENDED COMPLAINT**

*Merritt vs. JP Morgan, et al*